CHICAGO TITLE & TRUST CO. v. FEDERAL TRUST & SAVINGS
BANK et al.

(District Court, N. D. Illinois, E. D.    May 23, 1911.)

No. 9,743.

1. BANKRUPTCY (§ 163*)—PREFERENCES—APPLICATION OF BANK DEPOSITS TO
BANK DEBT—SET-OFF.

Bankruptcy Act July 1, 1898, c. 541, § 68a, 30 Stat. 565 (U. S. Comp.
St. 1901, p. 3450), provides that in all cases of mutual credits between
the estate of a bankrupt and a creditor the account shall be stated, and
one debt shall be set off against another, and the balance only shall be
allowed or paid.  Prior to bankruptcy, defendant bank, with which the
bankrupt did business, applied a balance due on the bankrupt's deposit
account, amounting to $3,095, to the bankrupt's indebtedness to the
bank, with knowledge that the bankrupt was then insolvent; later agree-
ing to pay certain pay roll and clearing house checks, provided the bank-
rupt would thereafter make deposits to cover the same.  After the ap-
plication of the $3,095 then on deposit, there was left to the credit of
the bankrupt's account $3.25, and the bank under its agreement paid
checks amounting to $2,506.46, to cover which the bankrupt deposited
$3,079, leaving a balance of $575.79, which the bank then also applied
to the bankrupt's general indebtedness to it.  Held, that the application
of the $3,095, and so much of the subsequent deposit as was sufficient to
pay the checks which it had agreed to meet, was proper, but that the
application of the balance of such subsequent deposit to the bankrupt's
indebtedness constituted a preferential payment, which was recoverable
by the bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 163.*]

2. BANKRUPTCY (§ 163*)—SET-OFF—MARGIN CERTIFICATES—PROCEEDS.

Bankruptcy Act July 1, 1898, c. 541, § 68a, 30 Stat. 565 (U. S. Comp.
St. 1901, p. 3450), provides that, in all cases of mutual debts between
the estate of a bankrupt and a creditor, the account shall be stated and
one debt set off against the other, and the balance only allowed or paid.
Section 68b declares that a set-off or counterclaim shall not be allowed
in favor of any debtor of the bankrupt which is not provable against
the estate, or which was purchased by or transferred to him after the
filing of the petition or within four months before such filing, with a
view to such use and with knowledge or notice that such bankrupt was
insolvent or had committed an act of bankruptcy.  The bankrupt, being
largely indebted to defendant bank, had deposited with defendant $4,250
to protect margin certificates issued to him by the bank to be used
in connection with the bankrupt's operations on the board of trade.  The
vice president of the bank, with knowledge of the bankrupt's insolvency,
after having called the bankrupt's loans and applied to the payment
of his debts to the bank the balance of the bankrupt's general deposit
account, had a conference with him and with another broker, in which
it was arranged that the latter should take over the bankrupt's open
trades, deposit other collateral therefor, and release to the bank the
margin certificates issued to the bankrupt, which, when accomplished,
the bank canceled and applied the value to the liquidation of the bank-
rupt's indebtedness on the day an involuntary bankruptcy petition was
filed against the bankrupt.  Held, that section 68a was not limited to
a case where the debtor of the bankrupt acquires a set-off, and that the
bank by so attempting to apply the proceeds of such certificates ac-
quired a preference which it was not entitled to keep as against the
bankrupt's trustee.

[Ed. Note.—For other cases, see Bankruptcy, Dec. Dig. § 163.*]

In Equity. Bill by the Chicago Title & Trust Company, as trustee in bankruptcy of Earl H. Prince, bankrupt, against the Federal Trust & Savings Bank and W. P. Anderson & Co. The case was submitted to a master, who advised a decree in favor of plaintiff for part of the relief demanded, after which exceptions were filed to the report. Overruled. Decree ordered in accordance with the recommendation of the master.

The following is the report of Master in Chancery Charles B. Morrison, in which (because of references thereto in his "Findings of Law") the paging thereof is here shown as far as necessary by figures in brackets:

### Findings of Fact.

The undersigned master finds the facts to be:

(1) About the parties to the suit:

That on February 15, 1905, and for several years before that date, Earl H. Prince was a member of the Board of [4] Trade of Chicago, engaged in the buying and selling of commodities, subject to the rules of the Board of Trade in that regard.

That during the same period the defendant the Federal Trust & Savings Bank was engaged in the general banking business in the city of Chicago, and Earl H. Prince was transacting his banking business with said bank, and had a general deposit and checking account therein.

That during the same period the defendant W. P. Anderson & Company, through its officers who were members of said Board of Trade, was also engaged in the business of buying and selling grain and other commodities on said Board, on time contracts, and otherwise.

(2) The rules of the Board of Trade:

That the rules of the Board of Trade are intended to, and do, facilitate settlement between the members by obviating the necessity of adjusting each particular trade between the parties thereto, and by furnishing a way commonly known as ringing up trades, by which each member makes one settlement through the Board which covers all of his transactions.

That on time contracts, the rules provide that [5] purchasers shall have the right to require of sellers, as security, a deposit of 10 per cent., based upon the contract price of the property bought, and further security from time to time as the market advances, and that sellers shall also have the right to require, as security from buyers, a deposit of 10 per cent. on the contract price of the property sold, and, in addition, any differences that may occur between the estimated value of the property and the price of sale.

The rules also provide that banks may be authorized to issue margin certificates to be used in such cases and become authorized depositories for securities on giving bonds for the proper disposal of deposits handled by them, and, when such banks are so authorized, they are known as "Board of Trade depositories," and the rules require that certificates must be issued by such banks in duplicate, and made nontransferable, for all deposits made with them. These certificates so issued must state by whom the deposits are made and for whose account they are held, and that the same are payable upon the return of the certificate, or the duplicate thereof duly indorsed by the parties to the contract, or on the order of the president of the Board of Trade. The rules prescribed the form in which the certificate shall be issued, and the memoranda thereof that shall be kept, and all certificates when issued are [6] required to be placed in the office of the clearing house of the Board, and all business pertaining to the issuance and use of said certificates are required to be carried on in accordance with the rules of the Board.

(3) About Prince's transactions with the Federal Trust & Savings Bank:

That the Federal Trust & Savings Bank was from August 20, 1902, up to, and including the month of February, 1905, a Board of Trade depository.

That on, and for several years prior to February 10, 1905, Earl H. Prince

had a deposit and checking account with the Federal Trust & Savings Bank, and on said 10th day of February was largely indebted to the bank on demand notes and otherwise, and on that day the bank called the said loans, and they were not paid, and thereupon the bank applied, as a payment upon the same, $3,095 then on deposit in Prince's checking and deposit account in the bank, which left to the credit of Prince in that account only the sum of $3.25. On the same day the bank agreed with Prince that, if he would thereafter make deposits to cover the same, it would pay certain salary and pay roll checks of employés of Prince and checks issued to the Board of Trade clearing house. That pursuant to said agreement the bank did pay such checks issued on the 4th, 7th, 10th, 11th, and 14th days of [7] February, 1905, amounting to $2,506.46, and the said Prince did deposit with the bank on February 10th after closing hours $1,450, on February 11th, $310, and on February 14th he made two deposits, one for $820 and the other for $499, making a total of $3,079. All of these items were entered on the books of the bank under date of February 14, 1905. It will be seen that the amount deposited under that arrangement exceeded the amount paid on checks in the sum of $572.54. This amount, which with the $3.25 remaining to the credit of Prince when the application of the $3,095 was made on February 10th, left a balance due Prince of $575.79, which balance the bank on February 14th applied on Prince's general indebtedness to the bank.

After the application and the arrangement of February 10th, the bank paid a clearing house check of $656.25, which on the close of business on that day left Prince's account overdrawn to the extent of $653. This however, was made pursuant to said agreement and was more than covered by deposits made by Prince after the close of business on the same day.

The other checks drawn by Prince on February 10th, and prior thereto, not included in the said arrangement between him and the bank, were presented to the bank for payment, and payment thereof was refused.

[8] (4) The margin certificates: Prince's trades, and how they were handled:

That on various days from September 15, 1904, to February 9, 1905, the Federal Trust & Savings Bank issued to Prince margin certificates to be used by him in his trades, and which were by him placed in the office of the clearing house of said Board in accordance with the said rules of the Board of Trade, as follows:

| September 15, 1904. | $ 300.00, Peavey Grain Co. |
| " 19, 1904. | 300.00, Peavey Grain Co. |
| " 23, 1904. | 250.00, Keith & Co. |
| October 17, 1904. | 250.00, Peavey Grain Co. |
| January 10, 1905. | 500.00, Pringle, Fitch & Rankin. |
| " 20, 1905. | 250.00, Peavey Grain Co. |
| " 31, 1905. | 250.00, Finley Barrell & Co. |
| " 31, 1905. | 250.00, Ware & Leland. |
| " 31, 1905. | 250.00, Ware & Leland. |
| February 6, 1905. | 300.00, A. J. White & Co. |
| " 6, 1905. | 250.00, Walter Comstock. |
| " 6, 1905. | 300.00, J. A. Edwards & Co. |
| " 7, 1905. | 300.00, Crighton & Co. |
| " 9, 1905. | 250.00, Pringle, Fitch & Rankin. |
| " 9, 1905. | 250.00, C. H. Canby & Co. |

Total amount.. $4,250.00.

That to procure said certificates, Prince drew his check against his checking account with the Federal Trust & Savings Bank, or deposited with it the requisite sum of money. Each of said certificates evidenced a liability of the bank to Prince for the amount stated in the certificate payable to him, unless required to be paid to the other parties named therein, because of a default by Prince on the contract for [9] which the certificate was held by the other party as security.

That a record of the issuance of margin certificates was kept in the bank in a "Margin Register," and the total of each day's margin certificates issued was entered in the ledger of the bank in an account called the "Margin

Account," and the total of all unpaid margins appeared on the bank's ledger as one of the items constituting its total liabilities.

(5) Transactions among Prince, the Federal Trust & Savings Bank, and Anderson & Co.:

That on the 14th day of February, 1907, Charles S. Castle, who was then vice president of the Federal Trust & Savings Bank, and Earl H. Prince had a conference at the bank in reference to the financial affairs of the said Prince, and while together Mr. Castle telephoned to W. P. Anderson, who was then president and treasurer of the said W. P. Anderson & Co., a corporation, asking him to come to the bank, which he soon thereafter did, and Mr. Castle informed Mr. Anderson that Prince was in financial troubles; that he had quite a number of open trades, and asked Mr. Anderson's advice as to the best way to close them. Mr. Anderson suggested that Prince transfer them to some other dealer and close them up in that way. Prince asked Mr. Anderson if his company would take them, and he agreed [10] that it would, if after examination the trades showed a profit. Investigation was made by Mr. Anderson, and he was satisfied with conditions, and on the same day, February 14th or the day following, Prince transferred all of his open trades in accordance with the rules of the Board, and Anderson & Co. assumed and agreed to carry out the contracts with the various parties with whom they were made.

That on the 15th day of February, 1905, the secretary of the Board of Trade, on the written request of Anderson & Co., notified members having trades with Prince to transfer them to Anderson & Co., and that Prince's sheet would clear on that day as usual, but that rings made for the following day would be closed by Anderson & Co. Anderson & Co. was fully substituted in place of Prince, and his trades were afterwards settled between Anderson & Co. and the other parties according to the customs and rules of the Board. When Anderson & Co. took over these trades, it purchased or sold in its own name enough grain and other commodities to correspond with, or balance, the amount of the open trades so transferred by Prince, and paid to, and received from the several members the respective amounts due to, or from them on settlements through the clearing house of the Board. The settlements were made as a part of the other regular business of Anderson & Co., and [11] in all respects the same as if the trades had been originally made by that company.

That on the substitution of Anderson & Co. for Prince on February 15, 1907, that company put up its own securities on all of Prince's trades, and thereby released the said certificates deposited by Prince to secure the same trades, and they were taken up by Anderson & Co., and, with the possible exception of the certificate of C. H. Canby & Co. for $250, were turned over to the Federal Trust & Savings Bank before the close of banking hours on that day. The certificate of C. H. Canby & Co., if not turned over to the bank before the close of banking hours, was turned over within a few minutes thereafter.

When the certificates were turned over to the Federal Trust & Savings Bank, Prince was indebted to that bank in a sum far exceeding the amount of said certificates so returned to the bank, but not in a sum exceeding $37,-000, and the Federal Trust & Savings Bank on the return of said certificates, which aggregated in amount the sum of $4,250, applied and credited the amount thereof on Prince's indebtedness to the bank.

That taking the said open trades so transferred as a whole, the condition of the market at the time of the transfer was such that the aggregate sum of the amounts due thereon [12] to Earl H. Prince from members of the Board of Trade, if he had then settled the trades, would have been greater than the aggregate sums of the amount then due thereon from Prince to others of said members of the Board. That among the open trades so transferred and settled were trades with the said members of the Board who held securities or margin certificates furnished by the said Prince.

That on February 15, 1905, the market was constantly changing. If the trades with the members holding Prince's margin certificates had been closed at the opening of the Board on that day by the members holding them, there

would have been due from them to Prince in the aggregate a balance of approximately one-third of the amount of the certificates after deducting therefrom the amount that would have been due to them from Prince. If the trades had been closed later in the day, the balance coming to Prince would have been considerably less. However, if Prince had carried out all of these contracts, the profits which he would have made upon some of them would have been about balanced by the losses which he would have sustained on others.

[13] (6) Prince becomes a bankrupt:

That on the 15th day of February, 1905, an involuntary petition in bankruptcy was filed against Prince in the District Court, and on the 30th day of March Prince was adjudged a bankrupt, and on the 18th day of May the complainant, the Chicago Title & Trust Company, was duly elected by the creditors, and appointed by the Honorable Frank L. Wean, referee in bankruptcy, as trustee in bankruptcy of said Earl H. Prince. That the trustee so appointed qualified as such and is still acting as trustee of said bankrupt.

That at the time of the transfer of the said trades to Anderson & Co., Prince was indebted, as appears from his schedules in bankruptcy afterwards filed, in the sum of over $100,000 to numerous other creditors besides the Federal Trust & Savings Bank for balances due them for margins deposited with said Prince as a broker, and otherwise, besides $1,000 due for labor to various employés of said Prince, and the assets, as appears from his schedules in bankruptcy, aside from the amount involved in this suit, were less than $50,000 in value, and it now appears that all of the assets of said Prince have been sold and converted into cash under the orders of the District Court, and that there is now in the hands of the trustee [14] a balance of only $1,180.83 received from such sale. That no fees have been paid to the trustee, referee, or attorneys, and no claims have been paid, nor have any dividends thereon been paid by the trustee.

That the plan adopted at the conference between Mr. Prince, Mr. Anderson, and Mr. Castle was doubtless the best plan that could have been adopted to avoid serious loss to Prince, or to his creditors. The condition of the market was such at that time that, had Anderson & Co. not taken charge of Prince's trades and carried them through, a panic might have ensued on the Board, and the market so fluctuated that the amount of all of the margin certificates, and quite likely a considerable more, would have been lost to Prince and his creditors.

(7) The Federal Trust & Savings Bank on February 10th, and from that time on, had reasonable cause to believe that Prince was insolvent, and that payments thereafter made to the bank were intended as preferences:

In the preceding findings the master has stated his conclusions as to the condition of the account between Prince and the Federal Trust & Savings Bank from February 10th to February 15th inclusive, and some of the principal facts in the order of their chronology. To justly determine [15] the rights and liabilities of the parties under the bankruptcy law, it is necessary to consider in a more comprehensive way the relations of the parties, the business in which they were engaged, and all of the facts and circumstances disclosed by the testimony which may throw light upon, or give color to, the transactions which took place during the five days preceding the filing of the petition in bankruptcy against Prince.

For several years prior to February 10, 1905, Prince did his banking business with the Federal Trust & Savings Bank. He not only had a checking and deposit account there, but the bank discounted his notes, and in other ways gave to him extensive credit. In 1902 the bank became a Board of Trade depository, gave its bond as required by the rules of the Board, and Prince, at least for some time prior to his failure, and presumably for several years before, had in the bank a margin account in which he deposited funds to protect margin certificates issued by the bank to be used by him in his deals on the Board, so that the relations between Prince and the bank were of a close and confidential character, and the bank was in a better position than any other of Prince's creditors to know his financial condition.

[16] On the 10th of February, Charles S. Castle, the vice president of the bank,

and Prince had a conference, and the relations that had theretofore existed were terminated. Practically all that Prince had on deposit in his general account on that day was applied on his indebtedness to the bank, regardless of the fact, which both Prince and Castle must have known, that checks previously drawn by Prince were outstanding and would afterwards be presented to the bank for payment. The testimony does not show how many, or in what amount, checks had been previously issued by Prince; but it does show that checks were afterwards presented to the bank and payment was refused. Prince and Castle were both experienced business men, and both knew that, if payment of his checks was refused by the bank, a day of reckoning was not far off.

The relations between Prince, the bank, and the Board of Trade were close. Under the rules of the Board, one or more of the executive officers of a bank which becomes a Board of Trade depository must be members of the Board.

The arrangement which was entered into at the bank on the 10th between Prince and Castle, by which it was agreed that clearing house and pay roll checks should be paid by the bank, and that Prince should deposit sufficiently to cover these payments, was calculated to keep Prince going [17] and to protect the clearing house, as well as the bank; but no provision whatever was made for other creditors. The reason for this arrangement is apparent, and it was made primarily in the interest of the bank. Had Prince failed to take care of his clearing house and pay roll liabilities, a failure would have immediately followed, and had he failed at that time, without transferring his trades so that they could be carried on to completion in the regular way, the result in all probability would have been that the amount of his deposits, $4,250, in the margin account, would have been wiped out, and the bank would have been compelled to pay out this money which it wanted to apply and afterwards did apply on Prince's indebtedness.

The 10th of February was on Friday. Prince was at the bank and in conference with Castle on every day from February 10th to February 15th. Monday, the 13th, was observed as Lincoln's birthday, so that the bank was closed on Sunday, the 12th, and Monday, the 13th; but this matter was of such moment that a conference was held on the afternoon or evening of the 13th between Mr. Castle, Mr. Prince, and Mr. C. C. Wolf, of Parkersburg, Iowa. Wolf had been dealing on the Board through Prince for several years, and in the course of his dealings had turned over to Prince a certificate of deposit issued by the Parkersburg bank, of which Wolf was [18] then the cashier, for $24,000, besides certain certificates of the capital stock of the same bank. Prince telephoned, the testimony does not show at what time, to Wolf to come to Chicago; that he (Prince) was in financial trouble. Wolf's train was delayed, and he did not reach Chicago until towards evening of the 13th. He went to Prince's office and there met Prince and Castle. Prince's financial difficulties were talked over, and Wolf was informed that Prince was indebted to the Federal Trust & Savings Bank to the extent, as Wolf understood, of $20,000 or $30,000, that his bank loans had been called, and that Prince must have help or quit business. Prince and Castle wanted Wolf to take up the certificate of deposit at its face value, $24,000, and help that much, and Wolf was under the impression that if that was done the bank would carry him along for the rest. Wolf for some reason failed to take up the certificate. Had Wolf taken up the certificate of deposit which the bank then held, the bank would have applied it on Prince's indebtedness and might have carried him along, but subsequent developments show that Prince would still have been insolvent.

No further effort seems to have been made by Prince or Castle to secure funds to continue Prince in business, and on the following day, the 14th, he transferred his trades [19] to Anderson & Co., and on the 15th notice was posted up on the Board of the transfer of Prince's trades, and on the same day Anderson & Co. put up its own securities and took up Prince's margin certificates, procured the indorsement of the other parties to the trades upon them and returned them to the bank, and the bank applied them upon Prince's general indebtedness, and on the same day an involuntary petition in bankruptcy was filed against Prince, as has already been stated in this

report. The testimony does not show whether the certificates were turned over to the bank before or after the filing of the petition; but, as both events occurred on the same day, they may be regarded as simultaneous.

### Conclusions.

On February 10, 1905, Prince was insolvent, and the bank knew it. Prince then had $3,098.25 standing to his credit in his checking account at the bank. He also had a certificate of deposit for $24,000 issued to C. C. Wolf by the State Exchange Bank of Parkersburg, Iowa, which was then up with the Federal Trust & Savings Bank as collateral. He also had other assets, which might be termed quick assets, the nature of which is not disclosed, upon which he could and did within the next few days realize $3,079. He also had on special deposit in the Federal Trust & Savings Bank [20] $4,250 placed there by him to protect his outstanding margin certificates, and at the same time he was so indebted to the bank that, had all of these assets been applied upon his indebtedness, there would still have been a balance due to the bank.

On the same day Mr. Castle, the vice president of the Federal Trust & Savings Bank, and Mr. Prince, the insolvent, undertook to so shape and control Prince's affairs and business that all of these moneys might be acquired by the bank and applied on Prince's indebtedness, and this, too, with every reason to believe that bankruptcy would soon overtake Prince. From February 10th on until the involuntary petition was filed against Prince, Prince and Castle operated together to bring about this result, and this is shown by what they did. On February 10th they applied $3,095 of Prince's balance on his indebtedness and entered into an arrangement by which pay roll and clearing house checks should be paid by the bank, and these payments covered by deposits to be made by Prince. This arrangement they carried out between February 10th and 14th. The bank paid such checks to the amount of $2,506.46, and Prince deposited to the amount of $3,079, leaving in the bank's hands $572.54, which, together with the $3.25 remaining in the bank amounted to $575.79, was on February 14th applied on Prince's indebtedness to the bank. On the 13th Prince and Castle had an [21] interview with C. C. Wolf, in which they tried to induce him to pay the face amount of the certificate of deposit, which he refused to do. Had he complied with their wishes, this amount would doubtless have been applied on Prince's indebtedness, as the bank held it as collateral. On the 14th of February Castle and Prince induced Anderson & Co. to take over Prince's trades; the bank agreeing to take care of some costs and expenses which it was thought might be, and which were in fact incurred. On the 15th of February, Anderson & Co., pursuant to the arrangement, did take over Prince's trades in such a way as to release the margin certificates put up by him. These certificates were on the same day indorsed by Prince and by the other parties to his deals, and returned to the bank, and the bank applied the amount which they represented and which was then on deposit in the bank on Prince's indebtedness to the bank.

The conduct of Prince's affairs for the five days preceding the filing of the petition against him is of such a character as to exclude every other conclusion, except that it was the intention of both Prince and Castle to reduce Prince's indebtedness to the bank as much as possible, by applying thereon all of his available assets and by so disposing of his business and open trades on the Board as to realize the greatest possible amount for the bank to the exclusion [22] of his other creditors.

The transfer of the $575.79 and the $4,250 to the bank were made with knowledge on the part of the bank that Prince was insolvent, and with a view to use these amounts as set-offs against Prince's indebtedness to the bank.

(8) The trustee in bankruptcy lays claim to the moneys applied by the bank on Prince's indebtedness:

That on November 25, 1905, the Chicago Title & Trust Company, by its attorneys, wrote a letter to the Federal Trust & Savings Bank, asserting its right as trustee of Prince, bankrupt, to the amounts applied by the bank on

Prince's indebtedness during the few days before the filing of the petition in bankruptcy against him.

### Findings of Law.

I find the law of the case to be that:

I. This is a suit brought by the Chicago Title & Trust Company, trustee in bankruptcy of Earl H. Prince, against the American Trust & Savings Bank, the successor of the Federal Trust & Savings Bank, to recover moneys placed in the bank by Prince which the trustee claims were transferred or paid to the bank in such a way and under such circumstances as to make them preferential payments within the meaning of the bankruptcy law.

The complainant relies upon sections 60a and 60b, as amended by Act Feb. 5, 1903, c. 487, § 13, 32 Stat. 799 (U. S. Comp. St. Supp. 1909, p. 1314), for its right to recover and its authority to prosecute this suit, which provide that:

"Sec. 60a. A person shall be deemed to have given a preference if, being insolvent, he has * * * made a transfer of any of his property and the effect of the enforcement of * * * such * * * transfer will be to enable any one of his creditors to obtain a greater percentage of his debt than any other of such creditors of the same class.

"Sec. 60b. If a bankrupt shall have given a preference and the person receiving it * * * shall have had reasonable cause to believe that it was intended thereby to give a preference, it shall be voidable by the trustee, and he may recover the property or its value from such person. * * *"

[1] The defendant the American Trust & Savings Bank claims that the application of the moneys on Prince's indebtedness to the bank was not preferential and was fully authorized by section 60a of the bankruptcy act, which provides that:

"In all cases of mutual debts or mutual credits between the estate of a bankrupt and a creditor, the account shall be stated and one debt shall be set off against the other, and the balance only shall be allowed or paid."

II. The application of $3,095, the balance, or practically so, standing to Prince's credit in the bank on February 10th, was not a preferential payment. The bank had the legal right to make the application under section 68a of the bankruptcy act, notwithstanding the fact that at the time the bank knew that Prince was insolvent. Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380.

The application of subsequent deposits sufficient to cover the $653 overdraft which existed at the close of business on February 10th, mentioned on page 7 of this report, did not amount to a preferential payment. Tomlinson v. Bank, 145 Fed. 824, 76 C. C. A. 400. The overdraft arose out of the special arrangements made on that day and in contemplation of deposits to be made under the same, and it is quite clear that the bank did not intend to extend further credit to Prince, and it gained nothing whatever by the transaction.

III. The application on February 14th of the $575.79, explained on page 7, and also on page 20, of this report, on Prince's indebtedness to the bank, gave the bank a preference over other creditors which it was not entitled to have. The dealings between Prince and the bank, which resulted in this balance, were carried on pursuant to special arrangements, and must be viewed in all respects as if no previous relations had existed between them. Prince was insolvent at the time, and the bank knew it. It was impossible for Prince and the bank to enter into or carry out any agreement or arrangement which would result in the payment of any part of Prince's general indebtedness to the bank to the exclusion of other creditors without violating the law, and, whether the application was consented to by Prince or not, it was not authorized by the bankruptcy act and amounted to a preferential payment within the meaning of the act of such a character that the trustee has the right in this suit on that account to recover that amount.

[2] IV. The application on February 15th of the $4,250 before then deposited with the Federal Trust & Savings Bank by Prince to protect margin certificates issued to him by the bank was a preferential payment or transfer as defined in sections 60a and 60b of the bankruptcy act, and the trustee has the right to recover that amount on that account in this suit. The facts upon

which this finding of law is based will be found in division 4, page 8, division 5, page 9, and under "Conclusions" commencing on page 19, of this report.

The money deposited by Prince to obtain these certificates was deposited for a special purpose—that is, to protect whoever became entitled thereto on the return of the certificates. The money was not deposited in Prince's general account. He had none. It was not subject to check and could not be paid out to any one except on the return of the certificates bearing the indorsement of Prince and the other parties to the deals.

Counsel on both sides made arguments, and presented authorities on the question as to whether these deposits were general or special, and on other questions pertaining to the relations that existed between Prince and the bank in reference to them. It will serve no useful purpose to determine these questions. All will agree that these moneys were not deposited in any general checking and deposit account, and that after deposit they could not be withdrawn by Prince or by any one else until the certificates were returned, and that Prince did not become entitled to draw these moneys or use them, or make any application of them whatever until February 15th, when the certificates were returned to the bank bearing the proper indorsements, and that Prince then was entitled to the money which they represented.

It is contended by counsel that the bank had the right under section 68a, already set out herein, to apply the $4,250, and that Bank v. Massey, 192 U. S. 138, 24 Sup. Ct. 199, 48 L. Ed. 380, sustains their contention. The facts in that case clearly distinguish it from the case at bar. The court held that the bank had a right to apply the balance due one of its depositors on his general indebtedness to the bank, although the bank had received deposits from him and permitted him to check against his account after it knew of his insolvency. In a general checking and deposit account there are mutual credits and mutual debits; every deposit carries with it a corresponding credit. The case lays down no new rule of law. It applied the general law of set-off as expressed in section 68a, and the rule ordinarily applied in cases where there are mutual accounts between the parties, and it is well settled that, unless there are mutual credits and debits arising out of a general course of business, the allowance of a set-off or counterclaim which results in giving a preference to one creditor over others is within the inhibition of the bankruptcy act. In re Lynden Mercantile Co. (D. C.) 156 Fed. 713; Irish v. Citizens, etc. (D. C.) 163 Fed. 888.

The set-off section (68) of the bankruptcy act is divided into two paragraphs, "a" and "b." So for this case has been considered under paragraph "a," which is materially qualified by paragraph "b," which reads as follows:

"A set-off or counterclaim shall not be allowed in favor of any debtor of the bankrupt which (1) is not provable against the estate; or (2) was purchased by or transferred to him after the filing of the petition, or within four months before such filing, with a view to such use and with knowledge or notice that such bankrupt was insolvent or had committed an act of bankruptcy."

The facts as found under division 7, page 14, and conclusions on page 19, of this report, bring this case clearly within section 68b. The return of the margin certificates and the consequent release of the money which they represented was accomplished by the combined efforts of Prince and Castle. The inevitable result of their efforts was to bring about a condition which would enable them to apply the money on Prince's indebtedness, and the law will conclusively impute to them the intention to bring about the result necessarily arising from what they did. Wilson v. City Bank, 17 Wall. 473, 21 L. Ed. 723. The facts of this case bring it within the rule laid down in the case of Western Tie Company v. Brown, 196 U. S. 502, 25 Sup. Ct. 339, 49 L. Ed. 571. See, also, In re White, 177 Fed. 194, 101 C. C. A. 364; In re Lynden Mercantile Co. (D. C.) 156 Fed. 713.

Counsel for the bank contends that section 68a is not applicable to this case, that it only applies to a case where a debtor of a bankrupt acquires the set-off, and the strict wording of the section supports this contention. I do not believe that so strict a construction is warranted. If it should pre-

vail, the whole object of the act would be defeated in many cases. The bankruptcy act is designed to prevent preferences in whatever form they may appear and to insure equality among all the creditors in the distribution of the bankrupt's estate. A creditor, when he acquires money belonging to a bankrupt, becomes a debtor, and is both debtor and creditor at the same time. Can it make any difference which is created first, the debit or the credit? The court, in Western Tie Co. v. Brown, supra, applied this section to a case on principle the same as this. Whatever may be said as to the application of this particular section, the facts of this case make it clear that Prince and the bank so shaped Prince's affairs that the bank was enabled to obtain a payment out of Prince's property of $4,250, in violation of the rights of other creditors. Such a transaction is within the condemnation of the different sections of the law relating to preferences and contrary to the wording and intent of the bankruptcy act.

I find and report that the complainant, the Chicago Title & Trust Company, is entitled to a decree against the Federal Trust & Savings Bank, defendant, for the payment of $4,825.79, with interest thereon from November 25, 1905, the date of the written notification mentioned on page 22 of this report. On the question of interest, see Irish v. Citizens' Trust Co. (D. C.) 163 Fed. 880, 892; Keady v. White, 168 Ill. 76–83, 48 N. E. 314; A., T. & S. F. R. Co. v. C. & W. I. R. Co., 54 Ill. App. 407; Deimal v. Brown, 136 Ill. 586, 27 N. E. 44; Steere v. Hoagland, 50 Ill. 377; Chicago v. Mutual Ins. Co., 218 Ill. 44, 75 N. E. 803.

It was agreed by counsel on the hearing that all questions as to the jurisdiction of the court are waived.

Wm. J. Pringle and Edwin Terwilliger, Jr., for complainant.
Tenney, Coffeen, Harding & Wilkerson, for defendants.

CARPENTER, District Judge. The master in this case has treated the matters under consideration with such accuracy, ability, and clearness that it is unnecessary for me to say more than that I approve of and adopt both his findings of fact and conclusions of law.

Accordingly, the exceptions taken in this court will be overruled, and a decree may be prepared in accordance with the recommendation of the master.